## IN THE UNITED STATES DISTRICT COURT
## FOR THE DISTRICT OF MINNESOTA

| | |
|---|---|
| **Jayme Prokes**; **Randall C. Eason**; and **Thomas P. Piekarski**, on behalf of themselves and others similarly situated, | Case No. 0:18-cv-2384-SRN-ECW |
| Plaintiff, | |
| v. | |
| **American Federation of State, County, and Municipal Employees, Council No. 5; American Federation of State, County, and Municipal Employees, Council No. 5, Local 2440,** and **American Federation of State, County, and Municipal Employees, Council No. 5, Local 221**, as representatives of the class of all chapters and affiliates of the American Federation of State, County, and Municipal Employees, Council No. 5; **American Federation of State, County, and Municipal Employees,** | **Plaintiffs' First Amended Class-Action Complaint** |
| Defendants. | |

Jayme Prokes, Randall C. Eason, and Thomas P. Piekarski are members or former member of the American Federation of State, County, and Municipal Employees, Council No. 5 (AFSCME Council 5). They bring this class action on behalf of themselves and others similarly situated, seeking redress for the defendants' past and on-going violations of her constitutionally protected rights.

### JURISDICTION AND VENUE

1.   The Court has subject-matter jurisdiction under 28 U.S.C. § 1331, 28 U.S.C. § 1343, and 28 U.S.C. § 1367.

2.     Venue is proper because a substantial part of the events giving rise to the claims occurred in the district of Minnesota. *See* 28 U.S.C. § 1391(b)(2).

## PARTIES

3.     Plaintiff Jayme Prokes resides in Le Sueur County, Minnesota.

4.     Plaintiff Randall C. Eason resides in Anoka County, Minnesota.

5.     Plaintiff Thomas P. Piekarski resides in Dakota County, Minnesota.

6.     Defendant American Federation of State, County, and Municipal Employees, Council No. 5 (AFSCME Council 5) is a labor union whose headquarters are located at 300 Hardman Avenue South, South St. Paul, Minnesota 55075.

7.     Defendant American Federation of State, County, and Municipal Employees, Council No. 5, Local 2440 (Local 2440) is a local union chapter affiliated with AFSCME Council 5. Its offices are located at 200 4th Avenue West Shakopee, Minnesota 55379. It is sued, along with American Federation of State, County, and Municipal Employees, Council No. 5, Local 221, as representative of the class of all chapters and affiliates of AFSCME Council No. 5.

8.     Defendant American Federation of State, County, and Municipal Employees, Council No. 5, Local 221 (Local 221) is a local union chapter affiliated with AFSCME Council 5. Its offices are located at 300 Hardman Avenue, South South St. Paul, Minnesota 55075. It is sued, along with American Federation of State, County, and Municipal Employees, Council No. 5, Local 2440, as representative of the class of all chapters and affiliates of AFSCME Council No. 5.

9.     Defendant American Federation of State, County, and Municipal Employees (AFSCME) is a labor union whose headquarters are located at 1625 L Street, NW, Washington, D.C. 20036-5687. AFSCME is affiliated with AFSCME Council No. 5.

## STATEMENT OF FACTS

10.  Plaintiff Jayme Prokes is a Financial Assistance Specialist for Scott County Health and Human Services. She has held this job since April 16, 2018. Ms. Prokes works in a bargaining unit represented by Local 2440.

11.  Plaintiff Randy Eason is employed by the Minnesota Department of Transportation. Mr. Eason works in a bargaining unit represented by Local 221.

12.  Plaintiff Thomas Piekarski is employed by the Minnesota Department of Transportation. Mr. Piekarski works in a bargaining unit represented by Local 221.

13.  Before the Supreme Court's ruling in *Janus v. American Federation of State, County, and Municipal Employees, Council 31*, 138 S. Ct. 2448 (2018), each of the plaintiffs worked in an "agency shop," where they were forced to either join AFSCME Council 5 and pay full membership dues, or else pay "fair-share fees" to the union as a condition of their employment. *See, e.g.*, Agreement Between the County of Scott and American Federation of State, County, and Municipal Employees, Council No. 5, Local 2440, article 4, § 1(B) (attached as Exhibit 2).

14.  The law of Minnesota authorized AFSCME Council 5 and its affiliates to collect payments from non-union members at the time of the plaintiffs' employment. *See* Minn. Stat. § 179A.06(3) (attached to the complaint as Exhibit 1).

### 1.  Jayme Prokes

15.  Ms. Prokes opposed and continues to oppose the payment of dues to AFSCME Council 5. Nevertheless, she chose to remain in the union because she would have been forced to pay "fair-share fees" had she resigned, and the difference in money between the full membership dues and the "fair-share fees" would not have been worth the loss of her vote and whatever little influence she might have been able to assert in collective-bargaining matters.

16.  After the Supreme Court's ruling in *Janus*, Ms. Prokes resigned her union membership and demanded that the union stop all union-related payroll deductions.

17.   On July 13, 2018, Ms. Prokes sent a resignation letter to AFSCME Council 5's headquarters by certified mail, return receipt requested. The letter stated:

> Effective immediately, I resign membership in all levels of the union.
>
> As a nonmember, I request that you immediately cease deducting all dues, fees, and political contributions from my wages, as is my constitutional right in light of the U.S. Supreme Court's ruling in *Janus v. AFSCME*. . . .
>
> Furthermore, I request that you promptly provide me with a copy of any dues deduction authorization—written, electronic, or oral—the union has on file for me.
>
> I trust that you will act promptly to properly observe my constitutional rights.

*See* Exhibit 3. An unsigned copy of Ms. Prokes's resignation is attached as Exhibit 3 to this complaint.

18.   The return receipt indicates that the union received Ms. Prokes's resignation letter on July 16, 2018. *See* Exhibit 4.

19.   The USPS tracking app on Ms. Prokes's iPhone shows that the post office delivered Ms. Prokes's resignation letter to union headquarters on July 16, 2018, at 11:26 A.M. central time. *See* Exhibit 5.

20.   The union refused to honor Ms. Prokes's resignation letter or instructions. When Ms. Prokes received her next paycheck on July 27, 2018, the union was still taking membership dues from her wages. *See* Exhibit 6.

21.   On July 27, 2018, Ms. Prokes e-mailed Lisa Fettig at the Payroll Department of Scott County, and asked why the county was continuing to deduct union dues from her paycheck. Ms. Prokes attached a copy of the resignation letter that she had sent to the union by certified mail, and she informed Ms. Fettig that her resignation letter had been mailed to AFSCME Council 5 "approximately 2 weeks ago." *See* Exhibit 7.

22.   Ms. Fettig then e-mailed Ms. Prokes and said: "Jayme—We have not received anything yet. I think you should call them. The last person that sent a similar letter to your called them and within a few days we had a e-mail advising us to the stop the deduction." *See* Exhibit 7.

23.   On July 30, 2018, union representative Kurt Erickson called Ms. Prokes to explain why the union was continuing to take membership dues from her paycheck. Mr. Erickson informed Ms. Prokes that she had signed a "Maintenance of Dues" agreement in 2016—and he claimed that this agreement forbids Ms. Prokes to resign her membership and stop the payment of dues unless she does so during a 15-day "opt-out window" that runs from January 3, 2019, through January 18, 2019.

24.   In 2016, when Ms. Prokes supposedly signed this "Maintenance of Dues" agreement, she was employed by the Minnesota Department of Corrections under a collective-bargaining agreement negotiated by AFSCME Council 5.

25.   Mr. Erickson told Ms. Prokes that the "Maintenance of Dues" agreement that she signed while working for the Minnesota Department of Corrections carried over to her new job at Scott County Health and Human Services—even though Ms. Prokes had quit that job nearly two years ago and worked at several non-union jobs before starting work at with Scott County Health and Human Services on April 16, 2018.

26.   On August 14, 2018, Ms. Prokes filed suit against AFSCME Council 5 and Local 2440, seeking an injunction and punitive damages for their illegal garnishment of her wages. *See* Original Complaint (ECF No. 1), at ¶¶ 18–37.

27.   On August 26, 2018, counsel for Ms. Prokes e-mailed the unions' lawyers and asked for a meet-and-confer session regarding motions for preliminary injunction and class certification that Ms. Prokes intended to file that would stop the unions from tapping her paycheck.

28.   On August 27, 2018, counsel for the unions replied by e-mail and wrote: "We are still in the process of investigating the underlying facts in this case, which we need to continue to do before we can participate in an informed meet-and-confer with you about Ms. Prokes' putative motions for a preliminary injunction and for class certification. We expect to have a better grasp of the facts in the next couple of days, at which point we will circle back with you to set up a meet-and-confer pursuant to L.R. 7.1(a)."

29.   On August 31, 2018, counsel for the unions e-mailed a letter to Ms. Prokes's attorney that said:

> Based on our review of the underlying facts and circumstances pertaining to Ms. Prokes' employment history and her membership in AFSCME Council 5, it was an error not to inform Ms. Prokes' employer, Scott County Health and Human Services, to cease deducting union dues from Ms. Prokes' wages when AFSCME Council 5 received Ms. Prokes' letter, on or around July 16, 2018, in which Ms. Prokes resigned as an AFSCME Council 5 member and requested that AFSCME Council 5 immediately stop deducting union dues from her wages.
>
> Consequently, AFSCME Council 5 immediately will inform Scott County Health and Human Services to cease deducting union dues from Ms. Prokes' wages. In addition, AFSCME Council 5 promptly will refund to Ms. Prokes all union dues deducted from her paychecks since July 16, 2018, plus the four-percent interest rate set forth in Minn. Stat. § 549.09. (The refund will include any dues that might be deducted in forthcoming pay periods, in the event that Scott County Health and Human Services should be unable to immediately cease the deductions.)

See Exhibit 12.

30.   The union's voluntary cessation of these unconstitutional payroll deductions after Ms. Prokes filed her lawsuit does not moot Ms. Prokes's claims for declaratory or injunctive relief. *See United States v. W.T. Grant Co.*, 345 U.S. 629, 632 (1953) ("[V]oluntary cessation of allegedly illegal conduct does not deprive the tribunal of

power to hear and determine the case, *i.e.*, does not make the case moot."); *City of Mesquite v. Aladdin's Castle, Inc.*, 455 U.S. 283, 289 (1982) ("[A] defendant's voluntary cessation of a challenged practice does not deprive a federal court of its power to determine the legality of the practice."). Nor does it prevent Ms. Prokes from representing the class of AFSCME members whose resignations were not promptly accepted or honored. *See Campbell-Ewald Co. v. Gomez*, 136 S. Ct. 663 (2016).

**2. Randall C. Eason**

31.   Mr. Eason, like Ms. Prokes, opposed and continues to oppose the payment of fees to AFSCME Council 5 and its affiliates.

32.   Mr. Eason joined AFSCME Council 5 and Local 221 at the outset of his employment because he was led to believe that union membership was a mandatory condition of his job. Mr. Eason was never informed of his constitutional right to decline union membership and pay a reduced amount in "fair-share service fees," and he did not become aware of this right until after the Supreme Court announced its ruling in *Janus*.

33.   After *Janus*, Mr. Eason repeatedly informed the union that he wanted to resign his membership and halt the payment of dues. The union, however, has refused to honor Mr. Eason's request and continues to take membership dues from his paycheck.

34.   During the summer of 2018, the union president and vice-president told Mr. Eason during a face-to-face encounter that he could not quit the union unless he did so during a 5-day opt-out window that comes around once per year. Mr. Eason asked these union officers when that 5-day window was. They told Mr. Eason that they would get back to him with that information, but they never did.

35.   Later that summer, Mr. Eason called the union and asked over the phone when his annual 5-day opt-out window would occur. The union representative on the

phone told Mr. Eason that the union would get back to him with that information, but they never did.

36.    To this day, Mr. Eason is unaware of when his 5-day opt-out window begins and ends, and the union has failed to provide that information despite his repeated requests.

37.    Mr. Eason remains a union member against his will, and the union continues to tap his paycheck for membership dues even though Mr. Eason has clearly communicated his desire to resign from the union and stop all union-related deductions from his paycheck.

**3.  Thomas P. Piekarski**

38.    Mr. Piekarski also opposes the compulsory payment of dues to the union. About four years ago he reluctantly agreed to serve as the President of Local 221 after someone nominated him for the job. But he resigned after less than two months because he was disillusioned with the union's leadership and with what he regarded as their misuse of union funds.

39.    On October 3, 2017, Mr. Piekarski e-mailed the union and demanded that they switch him to "fair-share fees," in accordance with his constitutional rights under *Abood v. Detroit Board of Education*, 431 U.S. 209 (1977). When his initial e-mail was returned as undeliverable, he re-sent the e-mail to Erica Kantola, the field representative for Local 221, and Eliot Seide, the executive director of AFSCME Council 5, on October 4, 2017. *See* Exhibit 8. The e-mail read as follows:

> This is Tom Piekarski from Local 221.  I would like to have my dues switched to Fare Share ASAP.
>
> Also, I would like to know what dues will be.
>
> Any questions/concerns, let me know.
>
> Thanks.

Tom Piekarski

*See* Exhibit 8.

40.   Instead of promptly implementing Mr. Pierkarsi's instructions, the union did everything possible to delay and thwart his efforts to switch to fair-share fees. On October 9, 2018, Erica Kantola wrote back to Mr. Piekarski and said: "Hi Tom, I am the new Field Rep for Local 221. I received your request to change to a fee payer. Would you be willing to talk to me a bit about the issues that are driving your request?" *See* Exhibit 9. On October 13, 2018, Ms. Kantola e-mailed Mr. Pierkarsi again and wrote:

> I left you a voicemail yesterday but I wanted to follow up with you to make sure we got this taken care of. When we spoke I had told you I needed to make sure of the need for the request to come with an original signature. That has been confirmed by membership.
>
> You can either print your email and sign it or write a separate note with your signature. That can be faxed, scanned and emailed or dropped off at the Council 5 office. As soon as I get that I can process your request to change your membership status.

*See* Exhibit 9.

41.   Mr. Piekarski protested that he had already submitted a signed copy of his previous e-mail requesting a switch to fair-share fees, as he had been instructed to do by the union, and that Ms. Kantola's demand for an *additional* signed document was unnecessary and unreasonably burdensome. He wrote:

> First and foremost, that is not what I was originally instructed to do. I sent copies of the the emails with Nick Zellmer (member of the e-board) to drop off, my signature is on it. I signed it and want my fare share dated back to 10/3/17, when I originally sent the email, like I was instructed to do.
>
> This is totally BS. I am sure if I was to go full share, you would probably come right to the shop, just like Bryce did when trying to sign the 1 year card. You can't go by an email, but you can go by a fax? Excuse me, but I think my email is more secure than a fax. Local 221 obviously

> has my email address and phone number for verification. How would
> you verify I faxed it? This to me is just a way to delay going fare share.
> My fare share is started 10/3/17, like the original email or I am re-
> questing a refund. And yes, like I said, many more are to follow.

*See* Exhibit 9.

42. Ms. Kantola responded to this e-mail and said: "Please submit the request
so I can process your request to change your membership status." *See* Exhibit 9.

43. On October 25, 2017, Mr. Piekarski e-mailed Ms. Kantola an attached doc-
ument with his signature, requesting a switch to fair-share fees. *See* Exhibit 10. Mr.
Piekarski said in the e-mail: "This is dated back to 10/3/17, from when I originally
requested this as I was instructed to do so. Any additional charges from that date, I
want refunded." *See* Exhibit 10.

44. On October 26, 2017, Ms. Kantola replied to Mr. Piekarski and wrote: "I
have submitted your request to membership today." *See* Exhibit 10.

45. Despite Ms. Kantola's assurance that she had forwarded Mr. Piekarski's
signed request, the union took no action and continued to collect full membership
dues from Mr. Piekarski's paycheck.

46. On July 9, 2018, after the Supreme Court's ruling in *Janus* and more than
nine months after Mr. Piekarski had first requested to switch to fair-share fees, Mr.
Piekarski e-mailed Michael Lindholt, the AFSCME field representative, along with
Brian Lindholt and Nate Smith, and wrote:

> Well my expectations were wrong, it did not get done by Christmas. In
> fact, nothing has been done yet, not that I am aware of. Erica had re-
> ceived the document last fall and was to have forwarded it on. I even
> gave a copy to Nick Zellmer with my signature requesting fair share.
>
> I do expect a full refund dating back to October 3, 2017, when this
> whole thing started. If you can not refund, I would like to know why?
>
> You want to talk about it, I am open. Tomorrow is out, I am having
> surgery. From Wednesday, 7/11/18 and on, I am available.

Let me know what is going to be done.

*See* Exhibit 9.

47.   On July 11, 2018, Mr. Michael Lindholt replied to Mr. Piekarski and wrote:

> Let me look into this Tom as the Temp field rep for local 221 and get some background information on this as well as to what happened in this e mail the images you sent came through as Facebook and you tube gifs. I am defiantly willing to discuss if your still open to it. But with bargaining and my assignments I won't be available until after next week if that will still work plus give you time to recoupe from surgery hope all goes well. I also apologize for the delay in response as I'm on a leave of absence until dec on lost time as a field rep for council 5 so I'm not in this e mail much

*See* Exhibit 9.

48.   On August 9, 2018, Mr. Piekarski e-mailed Michael Lindholt, Brian Lindholt, and Nate Smith once again and wrote: "Who do I need to contact to get this resolved. This is almost a year old now. Let me know, thanks." *See* Exhibit 9.

49.   Having received no response, Mr. Piekarski e-mailed John Westmoreland of AFSCME on August 12, 2018, and included his previous e-mail correspondence regarding his efforts to resign from the union and halt the payment of membership dues. He wrote:

> If you look at the previous messages, not sure what or who to contact to go fare share. I am willing to bet that if I wanted to go full share, you would be at Camden MNDOT shop Monday night to get me to sign.

> Let me know what needs to be done. So far, I have heard NOTHING from anyone since July 11, 2018. I am looking for a refund dated back to 10/3/2017, like in the original email.
> Let me know, thanks.

*See* Exhibit 9.

50.   On August 12, 2019, Mr. Westmoreland replied to Mr. Piekarski's e-mail and wrote:

I appreciate the history provided in this email chain, however the fact still remains we do not have a signed statement from you withdrawing from membership. In the end that is the one thing required to comply with your request.

To assure this is resolved, send a signed request to Bart Andersen and it will processed upon receipt. If you have any evidence a signed request was submitted to Council 5 previously, provide that to Bart Andersen as well. We can then process the second request of your email.

I have copied Bart Andersen, Council 5 Field Director in this email along with Tim Henderson, Council 5 Associate Director and Mike Lindholt, Field Representative to assure you have the proper contact information.

*See* Exhibit 9.

51.   On August 12, 2019, Mr. Piekarski wrote back to Mr. Westmoreland, explaining that he had already turned in a signed document expressing his desire to terminate his union membership and halt the payment of dues:

John, my first question is. . . . Did you read through all the emails?

I made a call to council 5 on OCT 3. 2017. They said to send an email to council5@afscme.org, which I did, and it bounced back as invalid address. Then I contacted Erica Kantola on 10/5/17. Now it seems the process has changed.

So, on Oct 14, 2017, at 9:42pm, I sent the following email:

It is as follows:

On Oct 14, 2017, at 9:42 PM, "piekarski2" wrote:
First and foremost, that is not what I was originally instructed to do. I sent copies of the the emails with Nick Zellmer (member of the e-board) to drop off, my signature is on it. I signed it and want my fare share dated back to 10/3/17, when I originally sent the email, like I was instructed to do.

This is totally BS. I am sure if I was to go full share, you would probably come right to the shop, just like Bryce did when trying to sign the 1 year card. You can't go by an email, but you you can go by a fax? Excuse me, but I think my email is more secure than a fax. Local 221 obviously

has my email address and phone number for verification. How would you verifiy I faxed it? This to me is just a way to delay going fare share. My fare share is started 10/3/17, like the original email or I am requesting a refund. And yes, like I said, many more are to follow.

Like I told Bryce, if there was no union, I know I would have a JOB, would you?

Thanks, but no thanks.

Tom Piekarski
[redacted]

Now, I handed my request and signature off to a person who was on the Local 221 E-board to drop off.

All this verification, signatures, etc. is just a ploy to keep me paying dues instead of going fare share. You have my email, my phone number, my address, my social security number, where I work, what time I work, what shop I work at, etc., what more do you need? Like I said before, if I wanted to go full share, I bet someone would be at my shop the very next day. Also, you might think about doing electronic signatures, save everyone a lot of time, hassle, and money.

One last thing. Another member got fare share near the same time I requested mine. All the person did was send in an email. Why did that request work and not mine?

Let me know, thanks.

Tom Piekarski

*See* Exhibit 9.

52.   On August 13, 2018, Mr. Westmoreland replied to Mr. Piekarski and wrote:

Tom,

I did read the email chain you sent me. We have one process for withdrawal and to this point do not have a signed request from you.

I provided the answer to resolve your request. Since this was the initial answer you received, it should be clear phone calls and emails are insufficient.

You may continue to debate this or get a signed request to Bart Andersen.

*See* Exhibit 9.

53.   On August 13, 2018, Mr. Piekarski replied to Mr. Westmoreland and wrote:

A couple of things.

One, I handed a signed request to Nick Zellmer, who was on the E-board at that time, to turn it in. I would think that was sufficient enough.

Two, how come another person at or near the same time, did not have to go through this whole ordeal of going fare share?

Three, send someone from local 221 to the Camden MNDOT shop this week, I work the graveyard shift, 7:00 pm to 5:30 am, Monday-Wednesday. I will have the signed statement for you, back dating it to 10/3/17.

Four, it was clear in the beginning on my initial phone call, to send an email..

Five, I have to assume that this will be back dated to 10/3/17. If any different, please let me know and why. Thanks,

Tom Piekarski

See Exhibit 9.

54.   Mr. Westmoreland replied to this e-mail and wrote: "I have provided you with the information to resolve your issue. Do with it what you will." *See* Exhibit 9.

55.   On August 14, 2018, Mr. Piekarski forwarded to Mr. Westmoreland the e-mail he had sent to Erica Kantola on October 26, 2017, which included an attached document with his signature demanding a switch from full membership dues to fair-share fees. *See* Exhibit 10. Mr. Piekarski wrote in this e-mail: "I think the email below

is proof enough that I submitted the document with the verification from Erica Kantola. If there are any issues with reimbursements and back dating to 10/3/17, please let me know." *See* Exhibit 10.

56.   Having heard nothing in response to this e-mail, Mr. Piekarski e-mailed the union officials against on August 24, 2018, and wrote: "Just wondering the status of this. I have not heard a word from anyone. This is going on 6 weeks now since the first email. Let me know, thanks." *See* Exhibit 10.

57.   The union finally stopped tapping Mr. Piekarski's paycheck in September 2018—nearly a year after he had first requested a halt to membership dues. *See* Exhibit 11.

## COUNT NO. 1—UNCONSTITUTIONAL AGENCY SHOP: REFUND OF PRE-*JANUS* COMPULSORY PAYMENTS

58.   The compelled subsidy that each of the plaintiffs was forced to pay to AFSCME Council 5 and its affiliates prior to *Janus* violated their constitutional rights—regardless of whether they chose to remain in the union and pay full membership dues (as the plaintiffs did) or resign their membership and pay "fair-share fees" (as others had done).

59.   The plaintiffs had no choice in whether to pay the union before *Janus*. Their only choice was whether to join the union and pay full membership fees, or decline union membership and pay a slightly reduced amount in "fair-share fees." Public employees such as Ms. Prokes, Mr. Eason, and Mr. Piekarski—who did not wish to join or pay the union yet became members on account of the compulsory "agency shop" arrangements—were compelled to pay the portion of their membership dues equal to the amount of "fair-share fees" that were imposed on every employee in their bargaining unit regardless of whether they joined the union.

60.   The Supreme Court's ruling in *Janus* is fully retroactive. *See Harper v. Virginia Dep't of Taxation*, 509 U.S. 86, 96 (1993) ("[A] rule of federal law, once announced and applied to the parties to the controversy, must be given full retroactive effect by all courts adjudicating federal law.").

61.   The unions defendants were acting under color of state law by enforcing these unconstitutional agency shops, in accordance with the laws of Minnesota that authorize agency-shops. *See* Minn. Stat. § 179A.06(3) (Exhibit 1); *Lugar v. Edmondson Oil Co. Inc.*, 457 U.S. 922 (1982).

62.   The union defendants therefore violated 42 U.S.C. § 1983 by enforcing these unconstitutional agency shops, and the plaintiffs and their fellow class members are entitled to a refund in the amount of the "fair-share fees" or the compelled portion of union-membership dues that they were forced to pay to the union against their will and in violation of their constitutional rights.

63.   The affirmative defense of qualified immunity is categorically unavailable to private entities such as labor unions. *See Wyatt v. Cole*, 504 U.S. 158, 161 (1992).

64.   Even if the unions could somehow assert an affirmative defense of qualified immunity or "good faith," those defenses can provide immunity only from money damages, and they do not confer immunity when a plaintiff seeks equitable monetary relief such as backpay, restitution, or unjust enrichment, which the representative plaintiffs and their fellow class members are asserting here. *See Wood v. Strickland*, 420 U.S. 308, 315 n.6 (1975), *overruled in part on other grounds, Harlow v. Fitzgerald*, 457 U.S. 800 (1982) ("[I]mmunity from damages does not ordinarily bar equitable relief as well."). A defendant is never permitted to *keep* property that it took in good faith but in violation of another's rights—even when the property was taken in good-faith reliance on a statute or court order believed to be constitutional at the time. Property that is seized pursuant to a statute that is later declared unconstitutional

must always be returned to its rightful owner, even if the property was confiscated in good faith.

65.   Taxes that are collected pursuant to a state statute that is later declared un-constitutional must be refunded to any taxpayer who sues within the relevant statute of limitations—even if the taxes were collected in good faith before the judicial pro-nouncement of unconstitutionality. *See Harper v. Virginia Dep't of Taxation*, 509 U.S. 86 (1993); *James B. Beam Distilling Co. v. Georgia*, 501 U.S. 529 (1991).

66.   Property seized pursuant to a replevin statute that is later declared uncon-stitutional must be returned to the original owner—even if the person seizing the property is allowed to assert a "good faith" defense to any collateral damage that he might have inflicted during the unconstitutional seizure. *See Wyatt v. Cole*, 994 F.2d 1113, 1115 (5th Cir. 1993).

67.   When fines are collected pursuant to a statute that is later declared unconstitutional, the government must return those fines—even if the fines were collected in good faith and in reasonable reliance on a statute that was believed to be constitutional at the time. *See United States v. Lewis*, 478 F.2d 835, 846 (5th Cir. 1973); *Neely v. United States*, 546 F.2d 1059, 1061 (3d Cir. 1976); *DeCecco v. United States*, 485 F.2d 372, 372–73 (1st Cir. 1973); *Pasha v. United States*, 484 F.2d 630, 632–33 (7th Cir. 1973).

68.   Crime victims who are awarded restitution from a convict must return that money if the statute on which the conviction was based is later declared unconstitutional. *See United States v. Venneri*, 782 F. Supp. 1091, 1092 (D. Md. 1991).

69.   The plaintiffs' demand for a refund of this unconstitutionally collected money is indistinguishable from the cases described above. The union must return this unconstitutionally taken property, just as defendants must return unconstitutionally collected taxes, unconstitutional fines, and unconstitutionally

forfeited property—regardless of whether they acted in good-faith reliance on statutes or court decisions that purported to authorize their conduct. Neither qualified immunity nor the "good faith" defense will ever allow a defendant to be enriched by his inadvertent constitutional violations, and they do not provide a defense when a plaintiff asserts claims for restitution of property that was seized in violation of his rights.

70.   In all events, the union defendants expected the Supreme Court to overrule *Abood* in *Janus*, so the union defendants cannot assert that they acted in accordance with a subjective "good faith" belief that the Supreme Court would approve the legality of their actions. AFSCME President Lee Saunders, for example, has publicly stated that he "expected" the Supreme Court to rule agency shops unconstitutional in *Janus*. *See* https://www.afscme.org/now/unions-arent-going-anywhere ("The court, as expected, ruled against us in *Janus* last summer") (last visited on April 1, 2019).

71.   The *Janus* ruling and the proceedings leading up to it have caused AFSCME and its leaders to repeatedly attack the integrity of the judicial system and United States Supreme Court:

a.   When the Supreme Court granted certiorari in *Janus*, AFSCME, in a joint statement with the National Education Association (NEA), the American Federation of Teachers (AFT)**,** and the Service Employees International Union (SEIU), called the *Janus* case "a blatantly political and well-funded plot to use the highest court in the land to further rig the economic rules against everyday working people." *See* https://bit.ly/2TVrKqv (last visited April 1, 2019).

b.   When the Supreme Court announced its ruling in *Janus*, AFSCME President Lee Saunders said: "Today's Supreme Court decision makes it perfectly clear working people can't get a fair hearing before today's

corporate controlled Supreme Court. . . . From the very beginning, the Janus case was about one thing and one thing only: corporate CEOs and wealthy special interests rigging the economy even more in their favor. Today the Supreme Court has shown that it is part of a rigged system that benefits the wealthiest Americans and no one else." *See* https://bit.ly/2tSr9e6 (last visited April 1, 2019).

c.   When the United States Supreme Court ruled in *Janus*, AFSCME, in a joint statement with NEA, AFT, and SEIU claimed that "billionaire CEOs and corporate special interests . . . succeeded in manipulating the highest court in the land to do their bidding." *See* https://bit.ly/2MxkrRy (last visited April 1, 2019).

72.   Ms. Prokes, Mr. Eason, and Mr. Piekarski are suing on behalf of all public employees who were compelled to subsidize AFSCME Council 5 or its affiliates against their will on account of these unconstitutional agency-shop arrangements. The class includes: (1) non-members of AFSCME Council 5 who were compelled to pay "fair-share fees" to the union; (2) employees who opposed payments to the union but who reluctantly joined because they decided that the difference between the cost of full membership dues and the mandatory "fair-share fees" would not have been worth the loss of their voice and vote in collective-bargaining matters; and (3) employees who opposed payments to the union but who joined because they were never informed of their constitutional right to decline union membership and pay a reduced amount in "fair-share fees." The class includes anyone who has ever fallen within this definition, including former and retired employees, and it includes anyone who comes within the class definition at any time before the conclusion of this action.

73.   The representative plaintiffs have Article III standing to bring these claims. They have suffered injury in fact because they were forced to pay money to AFSCME Council 5 and its affiliates as a condition of their employment. The injury was caused

by the unconstitutional behavior of the defendants, and the injury will be redressed by a refund of the money that the union unconstitutionally extracted from the representative plaintiffs and their fellow class members.

## CLAIM NO. 2—UNCONSTITUTIONAL GARNISHMENT OF WAGES POST-*JANUS*

74.   The unions have violated each of the representative plaintiff's constitutional rights by refusing to promptly honor and implement their requests to resign from the union and halt the payment of membership dues.

75.   *Janus* holds that public-employee unions are forbidden to collect money from a nonmember's wages unless the employee "clearly and affirmatively consent[s] before any money is taken." *Janus*, 138 S. Ct. at 2486.

76.   A public employee has a constitutional right to resign his union membership at any moment. *See Abood v. Detroit Board of Education*, 431 U.S. 209 (1977)).

77.   Ms. Prokes ceased to be a member of AFSCME Council 5 and its affiliates when the union received her resignation letter on July 16, 2018. Mr. Piekarski ceased to be a member when he e-mailed the union on October 3, 2017, to inform them that he wanted to switch to fair-share fees. Mr. Eason ceased to be a member when he informed union officials in person and over the phone that he no longer wanted to be a member.

78.   Any post-*Janus* money that the unions took from Ms. Prokes, Mr. Eason, Mr. Piekarski, or any other public employee who had previously informed the union of their desire to terminate their union membership or halt the payment of membership dues, violated their constitutional rights and must be returned.

79.   The unions' post-*Janus* defiance of the plaintiffs' instructions to terminate their union membership and halt the payroll deductions of union dues exposes the unions to punitive damages.

80.   Ms. Prokes, Mr. Eason, and Mr. Piekarski are suing on behalf of all employees in bargaining units represented by AFSCME Council 5 or its affiliates who, at any time after *Janus*: (1) informed the union that they wished to terminate their union membership or the payroll deduction of union fees; and (2) had union fees diverted from their paycheck after informing the union of their desire to terminate their union membership or halt the diversion of union fees. The class includes anyone who comes within the class definition at any time before the conclusion of this action.

## COUNT NO. 3—UNCONSTITUTIONAL REFUSAL TO ACCEPT MR. PIEKARSKI'S PRE-*JANUS* RESIGNATION FROM MEMBERSHIP

81.   In October of 2017, Mr. Piekarski informed the union that he wanted to resign his membership and switch to "fair-share fees," consistent with his constitutional rights under *Abood*.

82.   The union's refusal to promptly accept and implement Mr. Piekarski's resignation from membership, and their insistence that Mr. Piekarski take the needlessly burdensome steps of *repeatedly* submitting a hand-signed letter, violated Mr. Piekarski's constitutional rights.

83.   The union must refund to Mr. Piekarski the difference between full membership dues and "fair-share fees" that it improperly took from his paycheck between October 3, 2017, and June 27, 2018, the date on which *Janus* was announced. The union must also refund all money that it took from Mr. Piekarski's paycheck after June 27, 2018.

84.   Mr. Piekarski is suing on behalf of all employees in bargaining units represented by AFSCME Council 5 or its affiliates who, at any time before *Janus*: (1) informed the union that they wished to terminate their union membership or switch to payment of "fair-share fees"; and (2) whose instructions were not promptly honored

and implemented, retroactive to the date on which they first informed the union that they no longer wished to pay full membership dues.

## COUNT NO. 4—NEGLIGENCE

85.   The union defendants owe the plaintiffs and their class members a duty of care to promptly accept and implement their resignations from union membership and their requests to halt the payroll deduction of membership dues, without requiring public employees to retain counsel and sue to ensure that the union honors their instructions.

86.   AFSCME Council 5, Local 2440, and Local 221 breached their duty of care to each of the representative plaintiffs by refusing to promptly accept and implement their resignations from union membership.

87.   The union is therefore liable to Ms. Prokes, Mr. Eason, and Mr. Piekarski—and any other plaintiff or class member whose attempted resignation from the union was disregarded—in an amount to be determined at trial.

## COUNT NO. 5—CONVERSION AND TRESPASS TO CHATTELS

88.   Each plaintiff's paycheck and the right to immediate possession thereof belonged to that plaintiff, and the union defendants wrongfully interfered with that right by tapping those paychecks for membership dues.

89.   AFSCME Council 5 and its affiliates cannot defend their tortious behavior by relying on Minn. Stat. § 179A.06(3), because the statute is unconstitutional and unconstitutional statutes cannot confer immunity on tortious conduct. Nor can AFSCME Council 5 and its affiliates defend themselves by claiming that the plaintiffs "consented" to the payment of full membership dues. Any public employee who agreed to union membership before *Janus* did so while working in an unconstitutional agency shop, which *compelled* them to pay at least the amount of "fair-share fees" whether they joined the union or not. A pre-*Janus* public employee who agreed to

union membership consented to pay only the *difference* between full union dues and the compulsory "representation fees" that would have been imposed had they refused to join.

90.   The union defendants are therefore liable to the plaintiffs and class members in an amount to be determined at trial.

## COUNT NO. 6—UNJUST ENRICHMENT

91.   The plaintiffs and their fellow class members conferred substantial benefits on the union defendants.

92.   It would be unjust for the union defendants to retain benefits for violating the constitutional rights of the plaintiffs and their fellow class members.

93.   The plaintiffs and the class members are therefore entitled to equitable monetary relief from the union defendants in the form of restitution, backpay, unjust enrichment, replevin, detinue, or any other state-law cause of action that offers relief for this unlawful seizure of their personal property.

## COUNT NO. 7—DECLARATORY JUDGMENT REGARDING OPT-OUT WINDOWS AND MAINTENANCE-OF-DUES PROVISIONS

94.   The plaintiffs seek a declaratory judgment that public employees have a constitutional right resign from the union and halt the payment of membership dues at any moment, and that any union-imposed "opt-out" window that limits this constitutional right is unconstitutional and void.

95.   The plaintiffs also seek a declaration that any "maintenance of dues" agreement that forbids public employees to quit the union and terminate financial support unless they do so during a union-defined "opt-out window" is unenforceable and void. A public employee has the constitutional right to revoke his or her union membership and union-related payments at any time, and this right cannot be limited by a union-imposed "opt-out window." Any public-employee union that requires its

members to waive or limit their constitutional rights as a condition of union member-
ship is creating an illegal tie-in arrangement that misuses the monopoly power that
the union has been granted by the State. A public-employee union may no more re-
quire its members to waive or limit their *Janus* rights than it may require them to
waive or limit their right to practice their religion or their right to keep and bear arms.

96.   In addition, any "maintenance of dues" agreement that was signed before
*Janus* is not a valid agreement to continue paying membership dues in a right-to-work
environment. When Ms. Prokes signed her supposed "maintenance of dues" agree-
ment, she did so while working in an unconstitutional agency shop, which *compelled*
her to pay at least the amount of "fair-share fees" to the union whether she joined or
not. Ms. Prokes's pre-*Janus* consent to union membership—and her supposed con-
sent to this "maintenance of dues" agreement that was imposed as a condition of
union membership—was made under unconstitutional compulsion, and the union
never secured Ms. Prokes's freely given consent to pay full membership dues in a
right-to-work setting where employees have the right to withhold *all* financial support
from the union.

97.   Finally, the "maintenance of dues" agreement that Ms. Prokes signed is in-
valid and unenforceable because Ms. Prokes was compelled to sign it as a condition
of her employment with the Minnesota Department of Corrections.

98.   The plaintiffs respectfully ask the Court to declare annual "opt-out" win-
dows and "maintenance of dues" agreements unenforceable and enjoin the defend-
ants from enforcing them.

## COUNT NO. 8—FAILURE TO INFORM PUBLIC EMPLOYEES OF THEIR CONSTITUTIONAL RIGHTS, AND FAILURE TO SECURE FREELY GIVEN AND FULLY INFORMED CONSENT

99.   Mr. Eason has never provided his freely given and fully informed consent to
the payment of union membership dues.

100.   Mr. Eason was never even told that he had a choice to decline union membership and pay a reduced amount in "fair-share fees" before *Janus*, and he did not learn about this option until after *Janus* was decided.

101.   And in all events, Mr. Eason "agreed" to become a union member and pay membership dues while working in an unconstitutional agency shop, where he was compelled to pay *at least* the amount of "fair share fees" to the union regardless of whether he joined. An employee who joins the union under these circumstances has consented to pay only the *difference* between full membership dues and the "fair share service fees" that would have been imposed whether they joined the union or not. An employee's agreement to pay that difference does not represent "consent" to pay full membership dues in a right-to-work situation.

102.   Finally, a waiver of constitutional rights cannot be presumed, and must be "freely given and shown by 'clear and compelling' evidence." *Janus*, 138 S. Ct. at 2486. The union cannot continue tapping Mr. Eason's plaintiffs' paycheck—or any other employee's paycheck—unless it can show that the employee has *waived* his constitutional right to withhold payments to a public employee union, and such a waiver must be "freely given and shown by 'clear and compelling' evidence." *Janus*, 138 S. Ct. at 2486. The unions cannot make this showing when Mr. Eason was neither informed nor aware of his constitutional right to decline union membership when he joined the union. Nor can the unions make this showing when Mr. Eason joined the union at a time when employees who declined union membership were subjected to an unconstitutional financial penalty. A person who is told, "Sign this contract or else I will take $500 per year from your paycheck," and then signs the contract in response to this "offer," has not made a freely given or legally valid waiver of his constitutional right to decline union membership. *See Brady v. United States*, 397 U.S. 742, 748 (1970) ("Waivers of constitutional rights not only must be voluntary

but must be knowing, intelligent acts done with sufficient awareness of the relevant circumstances and likely consequences.").

103.   The unions therefore cannot treat Mr. Eason's pre-*Janus* decision to join the union as a "freely given" waiver of his constitutional right to withhold payments to the union in a post-*Janus*, right-to-work setting. Any such waiver of a public employee's *Janus* rights must be fully informed, freely given, and shown by clear and compelling evidence. *See Janus*, 138 S. Ct. at 2486.

104.   Mr. Eason is suing on behalf of all employees in bargaining units represented by AFSCME Council 5 or its affiliates who: (1) want to resign or have attempted to resign their union membership and terminate financial support of the union; or (2) would choose to leave or would have chosen to leave the union and terminate financial support if they were fully informed of their constitutional right to do so; or (3) would decline to opt in to union membership by providing "clear and affirmative assent" if they were fully informed of their constitutional rights under *Janus*. The class includes anyone who comes within the class definition at any time before the conclusion of this action.

105.   Mr. Eason seeks an injunction that prevents the union defendants from deducting or collecting union membership dues from the paychecks of public employees until that employee provides written consent to those payroll deductions that post-dates the Supreme Court's ruling in *Janus* and that includes the following language: "I understand that I am not required to join the union or pay money to the union as a condition of my employment. I further understand that a have a constitutional right to withhold all monetary payments to the union simply by resigning my union membership, and I understand that the union owes me a duty of fair representation regardless of whether I remain a member of the union or give money to the union. Nevertheless, I am freely choosing to waive my constitutional rights under the

Supreme Court's ruling in *Janus v. American Federation of State, County, and Municipal Employees, Council 31*, 138 S. Ct. 2448 (2018), and I knowingly and freely consent to union membership and to the payroll deduction of union membership dues. I understand that I may revoke my consent to the payroll deductions of union membership dues at any time by notifying my employer's payroll department in person, in writing, or over e-mail."

## PROPOSED CLASSES

106. The plaintiffs respectfully request that the court certify:

    a.  a defendant class of all AFSCME Council 5 affiliates, represented by AFSCME Local 2440 and AFSCME Local 221;

    b.  a class of all public employees who were compelled to subsidize AFSCME Council 5 or its affiliates against their will on account of these unconstitutional agency-shop arrangements. The class includes: (1) non-members of AFSCME Council 5 who were compelled to pay "fair-share fees" to the union; (2) employees who opposed payments to the union but who reluctantly joined because they decided that the difference between the cost of full membership dues and the mandatory "fair-share fees" would not have been worth the loss of their voice and vote in collective-bargaining matters; and (3) employees who opposed payments to the union but who joined because they were never informed of their constitutional right to decline union membership and pay a reduced amount in "fair-share fees."

    c.  a class of all employees in bargaining units represented by AFSCME Council 5 or its affiliates who, at any time after *Janus*: (1) informed the union that they wished to terminate their union membership or the payroll deduction of union fees; and (2) had union fees diverted from

their paycheck after informing the union of their desire to terminate their union membership or halt the diversion of union fees.

d.  all employees in bargaining units represented by AFSCME Council 5 or its affiliates who, at any time before *Janus*: (1) informed the union that they wished to terminate their union membership or switch to payment of "fair-share fees"; and (2) whose instructions were not promptly honored and implemented, retroactive to the date on which they first informed the union that they no longer wished to pay full membership dues.

### DEMAND FOR RELIEF

107. The plaintiffs respectfully request that the court:

a.  award damages or equitable monetary relief as set forth in this complaint;

b.  grant the equitable relief set forth in this complaint;

c.  grant the declaratory judgments set forth in this complaint;

d.  grant the injunctions set forth in this complaint;

e.  award pre-judgment and post-judgment interest;

f.  award costs and attorneys' fees under 42 U.S.C. § 1988 and any other applicable statute or rule of law or equity;

g.  grant all other relief that the Court deems just, proper, or equitable.

Respectfully submitted.

_/s/ Jonathan F. Mitchell_

Talcott J. Franklin*
Texas Bar No. 24010629
Talcott Franklin P.C.
1920 McKinney Avenue, 7th Floor
Dallas, Texas 75201
(214) 642-9191 (phone)
(800) 727-0659 (fax)
tal@talcottfranklin.com

Jonathan F. Mitchell*
TX Bar No. 24075463
Mitchell Law PLLC
106 East Sixth Street, Suite 900
Austin, Texas 78701
(512) 686-3940 (phone)
(512) 686-3941 (fax)
jonathan@mitchell.law

* admitted _pro hac vice_

Douglas P. Seaton
MN Bar No. 127759
Seaton, Peters & Revnew, P.A.
7300 Metro Boulevard, Suite 500
Minneapolis, Minnesota 55439
(952) 921-4604 (phone)
(952) 896-1704 (fax)
dseaton@seatonlaw.com

Dated: April 1, 2019

_Counsel for Plaintiffs and
the Proposed Classes_

## CERTIFICATE OF SERVICE

I certify that on April 1, 2019, I served this document through CM/ECF upon:

Leon Dayan
Bredhoff & Kaiser P.L.L.C
805 15 Street NW, Suite 1000
Washington, DC 20005
(202) 842-2600
ldayan@bredhoff.com

Gregg M. Corwin
Joshua Hegarty
Gregg M. Corwin & Associate Law Office, P.C.
1660 South Highway 100, Suite 500
St. Louis Park, Minnesota 55146
(952) 544-7774
gcorwin@gcorwin.com
jhegarty@gcorwin.com

*Counsel for Defendants*

                                        /s/ Jonathan F. Mitchell
                                        Jonathan F. Mitchell
                                        *Counsel for Plaintiffs and
                                        the Proposed Classes*